OF

## THE STATE OF NEW JERSEY.

### OCTOBER TERM, 1893.

---

ALEXANDER T. McGILL, ORDINARY.

---

ABRAHAM V. VAN FLEET, VICE-ORDINARY.

---

ANNA SANDERSON and WILLIAM BERDAN

*v.*

FRANK C. SANDERSON, SARAH SNYDER, GEORGE A. SAN-
DERSON, MARY E. THORP, MARGARET HAINES, ISABEL
F. LUDLUM and ELEANOR C. POST.

1. In the determination of an appeal from a decree of an orphans court,
based upon the verdict of a jury, which denies probate to a will, the preroga-
tive court will, notwithstanding the act relative to the effect of a jury trial
in proceedings touching the probate of wills, approved February 22d, 1892
(*P. L. of 1892 p. 28*), pass *de novo* upon the question whether the will shall be
admitted to probate, and, in so doing, will review the entire evidence adduced

243

Sanderson v. Sanderson.

in the court below and take additional proofs, if, in its discretion, it shall appear to it proper to do so.

2. The proofs, in the case considered, did not justify the verdict in the circuit and adjudication by the decree of the orphans court, that the testator lacked testamentary capacity and that the will was the product of undue influence.

3. The charges of an expert, produced by one of the parties to a will contest, without previous authority therefor from the court, will not be allowed from the estate of the decedent.

On appeal from decree of the Passaic orphans court.

*Mr. John W. Griggs,* for the appellants.

*Mr. John W. Harding,* for the respondents.

THE ORDINARY.

The questioned decree is founded upon the verdict of a jury in the Passaic county circuit court, to which court the orphans court of the same county certified the following questions :

"*First.* Were the papers presented for probate, purporting to be the last will and testament and codicil thereto of John Sanderson, deceased, signed, witnessed, published and delared by him according to the statute in such case made and provided ?

"*Second.* Was the said John Sanderson, at the time of making and declaring said will and codicil, of sound mind, memory and understanding, sufficient to make and publish a will?

"*Third.* Was the making, signing and publishing of said alleged will and codicil procured through undue influence, imposition or fraud from or by Anna Sanderson, a legatee or devisee named in said will, or by any other person or persons ?

"*Fourth.* Are the said papers, purporting to be the last will and codicil, propounded for probate by the proponents, the last will and testament and codicil of John Sanderson, deceased ?"

The issues framed upon these questions were submitted by the circuit court to a jury, with the result that the first and third questions were answered in the affirmative and the others were answered in the negative.

The matter was certified back to the orphans court, and the decree now disputed was thereupon signed by the latter court.

It denies probate to the disputed papers as the last will and testament of John Sanderson, deceased.

The decree is objected to, not only because it refuses probate, but also because it directs that $150 be paid out of the estate of the decedent to an expert witness on mental diseases, who was used at the trial in the circuit court in behalf of the respondents, the caveators below.

Upon this appeal it is, in the first place, urged that the act relative to the effect of a jury trial in proceedings touching the probate of wills, approved February 22d, 1892 (*P. L. of 1892 p. 28*), which provides

"that the verdict of a jury in any proceedings touching the probate of a will, heretofore or hereafter rendered, shall be conclusive and final upon any issue of fact found by such jury, subject to be set aside only for such reasons as would justify the setting aside of verdicts in ordinary proceedings at common law,"

introduces a new rule for the prerogative court in consideration of appeals in cases where the decree of the orphans court appealed from is founded upon the verdict of a jury, the contention being that the prerogative court is bound by the verdict of the jury upon all issues of fact, unless it shall be justified in disregarding the verdict for reasons which would have induced a common-law court to set aside a similar verdict upon an issue there. It is obvious that the effect of the innovation contended for, would be to deprive this court of the right to radically review the substance of the issue in probate cases where a verdict is had. In such cases, instead of hereafter passing *de novo* upon the question whether the disputed paper shall be admitted to probate, considering all evidence previously adduced, taking additional evidence if necessary or just, and weighing and giving effect to the proofs thus had, according to its judgment, as heretofore (*Read v. Drake, 1 Gr. Ch. 78; Rusling v. Rusling, 9 Stew. Eq. 603; White v. Starr, 2 Dick. Ch. Rep. 245; Smith v. Smith, 3 Dick. Ch. Rep. 566*), the court's jurisdiction would be restricted to a simple review of the action of the jury, as a court of common law would review it upon a motion for new trial, and to an

inquiry into the technical form and regularity of the decree. It cannot be denied that such effect would be to seriously abridge the scope of the court's jurisdiction. If such be the legislative purpose, it is abortive, for the jurisdiction of this court, in its full vigor and extent, is enjoined and assured by the constitution and is beyond legislative control. *Harris* v. *Vanderveer's Executor,* 6 C. E. Gr. 424; *Traphagen* v. *Township of West Hoboken,* 10 Vr. 232, 236; *Green* v. *Jersey City,* 13 Vr. 118; *Flanagan* v. *Plainfield,* 15 Vr. 118.

I proceed, then, to the determination whether the papers in dispute shall be admitted to probate as the will of John Sanderson, as though the case had its inception in this court.

John Sanderson died on the 29th of August, 1892, aged about seventy-two years. He had been a resident of Paterson for many years, and there enjoyed the reputation of being a substantial citizen. He had been a judge of the court of common pleas, a member of the lower house of the state legislature, a trustee of the church with which he was connected and a reputable and trustworthy merchant.

Until after his second marriage, in January, 1891, he resided in apartments over his store.

He had eight children by his first wife and none by his second. These children, with the exception of a son, John, who predeceased him in May, 1892, are the caveators below and the respondents upon this appeal. His first wife died in 1887. At the time of her death his children, except a daughter, Eleanor, had all married and left the paternal abode. In October, 1889, Eleanor married and went away, so that then the father, at the age of nearly seventy years, was left to live alone. It is true that his sons John and Frank assisted him in his business, and that, from time to time, his daughters called upon him, and, by little attentions to his household matters, contributed something to his comfort, but, when his store was closed, for the greater part of his leisure hours, he was alone. He had been accustomed for years to the companionship of wife and children, and the solitude of his situation, with wife dead and children scattered and absorbed in new interests and other lives, together

with the admonitions of failing strength, attendant upon his advancing age, furnish a reason and excuse for a second marriage. In the summer of 1890 he met the appellant, Anna Sanderson, while she was visiting at Paterson, and the following January he married her. She was then a widow named Billingsby, resident in the city of Baltimore, and his junior by some thirty-five years.

Conscious that his daughters would not approve of his proposed remarriage, he did not apprise them of his determination until a little more than a week before the wedding took place. Then he procured the wife of his son John to write each of them an invitation to the wedding. Shortly afterwards the invitations came back to him from his affianced wife, together with a letter which his daughters had written to her, couched in this language:

"Mrs. Billingsby's unique invitations to her marriage are returned by John Sanderson's daughters with neither congratulations nor regrets.

"Paterson, January 7th, 1891."

When he brought his bride home, he discovered that his daughters had visited his house in his absence and taken from it their mother's portrait.

After his return none of his children, except his sons John and Frank, called upon his wife. On the contrary, his daughters carried their disapproval of his marriage to the extent that they not only failed to visit him, but even refrained from recognizing him when they accidentally met him upon the street or in public conveyances. His son George called upon him only once, and that was not to pay his respects to the new wife, but to borrow money.

In the month of March following the marriage, he purchased a dwelling on Ellison street, in Paterson, some distance from his store, taking the deed for it in the joint names of his wife and himself, so that the survivor of them should have the property. The property thus purchased was encumbered by a mortgage for $3,000. The following May he made the will in dispute. Its scheme is, that the mortgage upon the Ellison street property shall be paid, and that his wife shall have that house with its furni-

ture and also $20,000, and that the remainder of his estate shall
be equally divided between his sons John and Frank. It ex-
pressly provides that none of his other children shall have any
part or share in his estate. His wife and his son John are
named as the executors of the will.

On the 3d day of May, 1892, about a year after the will
was executed, the son John died, and on the 11th of the same
month, by the codicil in dispute, William Berdan, the brother
of John's wife, was substituted as executor in John's place, and
in all other respects the will was reaffirmed as it had been made
the year before. Three and a half months after making the
codicil Mr. Sanderson died.

The proofs show that the testator's estate, exclusive of the
Ellison street property and its furniture, and the good will of
his business, at the time the will was made, was fairly worth
little more than $20,000, but at the same time they disclose that
Mr. Sanderson estimated his store property at a price several
thousand dollars beyond its real value. He apparently did not
realize that which was a fact, that his business property had
depreciated in salable value during his ownership of it because
of the incoming of objectionable surroundings. I think that the
proofs justify the conclusion that he believed that his will would
give his sons John and Frank some $10,000 or more.

No question is raised as to the formality of the execution of
the will and codicil.

The allegation is that when the instruments were executed
Mr. Sanderson lacked testamentary capacity, or, possessing it,
was unduly influenced and coerced into the execution of those
instruments.

The testimony shows that after his remarriage, or even before
it, he became subject to fits of despondency, evinced by his crying
without apparent immediate cause, and also that he suddenly
commenced to drink to excess. One of his intimate friends,
produced as a witness for the caveators, testified that he appeared
to be worried and uneasy about something all the time and
would drink a dozen times a day. He appears to have talked
to this friend and to have given him to understand that he had

Sanderson v. Sanderson.

determined that the children who did not come to see him should not participate in his estate, but that his sons John and Frank should share in it.   As he talked about the treatment of his children he would cry.   Other testimony also shows most conclusively that, after his marriage and his desertion by his daughters, he acquired habits of intemperance, which may reasonably account for a great portion of his conduct which is now relied upon as evincing testamentary incapacity.

The respondents proved that shortly after their mother's death their father began to pay more attention to his dress, making it more youthful, and to comment upon his physical appearance and the consideration he received from the opposite sex, and at the same time to exhibit a decided interest in that sex which ill comported with his former dignity and self-control.   They also proved that he frequently complained of dizziness, and lost interest and zest in his business, became penurious, rambled to some extent in his conversation and was somewhat forgetful of recent events.   Two or three incidents are strongly urged as evidence of a decided failure of mental power.   One is narrated by the respondent Frank Sanderson, who testifies that one morning in May, 1891, the month when the will was made, he looked out of a window at the store and saw his father standing in the street dressed in coat, vest and underdrawers, with his pantaloons over his arm; that he took his father into the store, where he appeared to be dazed, and failed to reply when asked how he came to be in that condition.   The witness did not call a physician.   After the father had rested a short time, he was again in full possession of his faculties.   The witness does not know whether he had been drinking.

Another instance is related by William T. Ludlum, the husband of the respondent Isabel Ludlum.   He says that early one Sunday morning, after Mr. Sanderson had moved to Ellison street, the witness found him sitting on the curb of the sidewalk, and, upon asking him for an explanation of his situation, was told that he was not feeling well, that his head bothered him and he had come there for fresh air.

Gilbert Reilly, a livery stable keeper, also testified that he

saw Mr. Sanderson, a few days before his second marriage, sitting in his wagon at the side of a street in Paterson, and that the witness went to him and spoke to him, and, Mr. Sanderson failing to recognize him, asked, "Who are you?" and when the witness asked him if he did not know Gilbert who used to live at Judge Hopper's, Mr. Sanderson said, "Oh, yes, Gilbert," and, after asking how Reilly's family was, looked about and complained that everything was upside down and "so funny," and asked the witness to drive him a little way, and the witness drove him home. The witness did not notice that he was intoxicated, but said that the neighborhood in which he found him abounded in drinking saloons.

It is obvious that each of these instances respectively may be attributed either to the effect of Mr. Sanderson's unfortunate habits or to a temporary pang of the disease which caused his death. Especially is this true when an attempt is made to reconcile them with other testimony and other established conditions of his mind. Mr. Sanderson's family physician, an old and experienced practitioner, testified that in April, 1891, Mr. Sanderson had an attack of the grip, for which he was treated a short time while he was attending at his store and business as usual, and that later, in the summer of 1892, for two months preceding his death, the doctor again attended him, treating him for diabetes, of which he died. For the first of these last two months he was confined to his house, and only during the last of them, to his bed. Through both sicknesses the physician noted that, though he suffered from muscular weakness and pains in his head, he continuously retained a clear intellect.

By other witnesses it is shown that, during his last sickness, he controlled his bank account, signing all drafts upon it, and that his son Frank, who was his salaried clerk, constantly made reports to him concerning his business. Several witnesses, apparently free from all interests, whose credibility cannot be doubted, speak of him as having possession of a clear understanding to the very end of his life.

But, putting aside the testimony of the witnesses produced by the appellant, I think that the testimony of the sons Frank and

George and the son-in-law Ludlum make the fact clear that Mr. Sanderson usually possessed intelligence in ample degree to enable him to make testamentary disposition of his property. The proofs certainly did not establish that he suffered from a fixed mental disease which incapacitated him to make the will. At most, his mental aberrations, whether produced by intoxication or disease, were temporary and fleeting. Under such conditions, the burden of proving incapacity at the very time when the disputed papers were executed, was upon the caveators.

The papers were drawn under the supervision of Alexander Elliott, a reputable member of the bar of this state. It appears that the wife of Mr. Elliott and the appellant Anna Sanderson are cousins. It was at the house of Mr. Elliott that Mr. Sanderson first met the appellant, and it is shown that, after his marriage, Mr. Elliott and his wife were accustomed to visit his house. Upon occasion of one of those visits, Mr. Sanderson called Mr. Elliott aside and told him he wished to make his will, and then proceeded to instruct him particularly concerning its provisions, expressly naming his sons John and Frank as the residuary legatees and devisees, and declaring his intention that his other children should not share in his estate. After a delay of more than a week, during which Mr. Sanderson asked if the will had been prepared, the instrument was drawn and Mr. Sanderson was summoned by telephone from his store to Mr. Elliott's office. He went there alone and was ushered into Mr. Elliott's private room, where Elliott handed him the will to read, and where, after reading it for fifteen or twenty minutes, he declared it to be correctly drawn, and thereupon Mr. Elliott summoned two law students from the outer room of his office, and the will was duly executed in their presence. The following year the codicil to the will was also executed in similar manner, in Mr. Elliott's office, in the presence of a young lawyer and stenographer attached to the office. To the subscribing witnesses to these papers and to Mr. Elliott, Judge Sanderson appeared to be in full possession of his faculties.

Passing to the question whether Mr. Sanderson was unduly influenced to make the will and codicil, I have this statement

of fact urged upon me: Mrs. Sanderson, comparatively young, married an old man without announcing her intention to do so to his daughters, though when she became engaged she was in Paterson, where most of them resided. She preserved the insulting letter which they wrote her when they were invited to her wedding, anticipating that she might need it some day. When she and her husband moved to Ellison street to reside, she told Frank Sanderson that there would not be room for him there. Her son by her former husband once stated that if his mother should die he would get Judge Sanderson's property. When Judge Sanderson was on his deathbed and it became necessary for him to authorize some one to sign bank checks and his son Frank sought that authority, Mrs. Sanderson objected that she should have the authority, and procured it from her husband. Mr. Sanderson appeared to fear her, and, apparently because of that fear, said to certain interested witnesses that he did not want to see his children. The draughtsman of the will, Mr. Elliott, was the husband of Mrs. Sanderson's cousin, at whose house she had been accustomed to visit, and not the lawyer whom Mr. Sanderson was accustomed to employ. That after Mr. Elliott had instructions to prepare the will, Mrs. Sanderson asked him if he had done so. That the will is inofficious. Upon which statement of fact is based the following argument: That the disparity of ages marks the marriage as a mercenary one upon the part of Mrs. Sanderson. The preservation of the insulting letter indicates an anticipation of a contest with the writers of it. The statement to Frank Sanderson that there was no room for him in the Ellison street house shows a desire to separate the father from his children. The taking to herself the power of attorney to sign bank checks evinces a power over her husband and a zealous establishment of herself in possession of her husband's moneys. Her son's boast indicates a repetition of his mother's conversation. That the coupling the condition of mind thus evidenced with the fact of the employment of Mr. Elliott, her cousin's husband, to draw the will, her inquiry of him concerning the preparation of that instrument, and the character of the will when prepared, in effect

giving her her husband's entire estate to the exclusion of his chil-- dren, and the mental condition of the testator, inferentially estab- lish a presumption against the instrument as the unconstrained act of Judge Sanderson, which presumption must prevail if not successfully rebutted, and that it has not been rebutted.

I think that the chief difficulty in this argument is that the inferences relied upon are not natural or necessary. Even though Mrs. Sanderson does not say that she loved the judge when she married him, it by no means follows that the marriage was a purely mercenary one upon her part. The mind readily suggests other possible motives that may have induced her to enter into it. It does not appear to be impossible that Mrs. Sanderson may have desired the companionship and protection of a respected husband or the guidance of the strong will of a man for her son, or that other advantage equally potent moved her. The preservation of the insulting letter was not unnatural and cannot be reasonably ascribed to a vicious design. It is to be remembered the letter was sent by her from Baltimore to Judge Sanderson in Paterson, and that he must have preserved it from destruction in order that it should have fallen into her hands again. May not the same motive which impelled him to preserve the letter have caused her to still further preserve it? So the statement to Frank Sanderson, that there was not room for him at the Ellison street house, might have been the truth without design. The taking to herself the power of attorney to sign checks may, as she says, have been only because she thought it would appear better for her, the wife, to be her husband's attorney. There is not a scintilla of evidence to connect her son's boast with anything which she said or did. The employ- ment of Mr. Elliott was not unnatural. His wife and Mrs. Sanderson were cousins. They frequently visited each other, particularly on Sundays. When the Sandersons moved to Elli- son street, the Elliotts became accustomed to go there and spend Sunday evenings. Mr. Elliott and Judge Sanderson were thus thrown constantly together and became better acquainted. It was upon the occasion of one of these Sunday visits that Mr. Elliott was taken down stairs, where he and Mr. Sanderson were

alone together, and the instructions for the preparation of the
will were given.   That Mrs. Sanderson afterwards inquired if
Elliott had prepared the instrument is not strange, for it is not
pretended that the judge kept his purpose to provide for her
secret, and its advantage to her, in view of the hostile attitude
of the judge's children, was most apparent.   The disposition of
the testator's property appears to have been unnatural only in
the sense that it expressly denied several of his children any
part of his estate.   But was it unnatural that the man who had
been neglected, insulted through his wife and ignored in his old
age by children upon whom, the proofs show, he had lavished
money and affection, should mete out to those cruel children
the punishment which the law permitted him to inflict?   The
power to dispose of property by will is a weapon to the weak
and the old, to protect them from abuse and neglect and to
enable them to punish those who, bound to them in duties
imposed by ties of blood, fail to perform those duties.   An
apparently inofficious will is readily explained by the inofficious
conduct of those who complain of it.

I do not think that the circumstances relied upon to raise a
presumption against this instrument are sufficient for that pur-
pose.   Clandestinity and apparent control of the testator, most
important *indicia* of undue influence, are absent.   But more
than this, there are additional circumstances which must be
coupled with the circumstances thus relied upon, in the court's
consideration of this question.   They are these : when the will
was executed John Sanderson was not called from his wife's
immediate control, but from his place of business, from which
he went voluntarily and alone to Mr. Elliott's office and there
read the will over with care and deliberation before he executed
it.   If Mr. Elliott tells the truth, and I perceive no reason to
doubt him, not the least effort was made by him to induce Mr.
Sanderson to execute the instrument.   There was no haste in its
preparation after the instructions for it were given.   A year
after the will was executed, the testator's son John, who was an
executor of the will, died.   Mrs. Sanderson then could have had
no object in adding another executor.   John's death left her sole

Sanderson *v.* Sanderson.

executrix of the will, and would give her sole control of her husband's estate. Yet, at this juncture, we find the testator again going to Mr. Elliott and causing him to prepare a codicil to the will, by which the brother of John's wife was made an executor in John's place, and the will, as made the year before, was expressly reaffirmed. So far as the testator's children are concerned, the will carries out his declarations not only to his son John's widow, but also to one of the witnesses produced by the respondents, to the effect that he would remember his sons John and Frank, but would not give anything to the daughters who failed to visit him. Mrs. Sanderson also offers herself as a witness, and, under her oath, declares that she never did anything to unduly influence her husband.

Upon a review of all the proofs, I am of opinion that they are neither sufficient to show undue influence nor to raise a presumption against the instrument.

Referring to the objection to the allowance of $150 for the payment of an expert in mental diseases, produced as a witness for the respondents, it appears that the expert was selected by the respondents without previous conference or agreement with the proponents and without previous authority from the court, and that he went upon the witness-stand in the belief that the respondents were his employers and responsible for his compensation. The influence of his employment was upon him. He did not come into the case clothed as a disinterested arbiter of the matter submitted to him. He was the exponent of the party producing him, assuming the attitude of one who challenges combat with his arguments and conclusions. His credibility and qualifications were in issue.

I think it would establish an unwise precedent to mulct a decedent's estate with the charges of such witnesses. Produced at the will of the parties to the contest, their multiplication, necessary, perhaps, to enable the court to reach a correct conclusion, would be apt to entail serious expense upon the estate and bring the administration of justice, through such expensive practice, into just condemnation. If it be necessary to have the assistance of experts, whose charges are to be borne by the

estate, their production should be authorized and they should be chosen by the court after hearing the parties to the contest. In consonance with these views, I find the well-considered opinion of the supreme court of California, in *Faulkner* v. *Hendy, 79 Cal. 265.*

I think that the orphans court should not have allowed the charge in question.

I will reverse the decree of the orphans court and admit the will and codicil to probate.